```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x
JOSE CARRION,                       :
            Plaintiff,              :    05 Civ. 189   (PAC)
       - against -                  :    OPINION & ORDER
WILLIAM E. PHILLIPS, Superintendent,:
Greenhaven Correctional Facility
                                    :
            Defendant.
                                    :
-----------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: NOV 15 2005

HONORABLE PAUL A. CROTTY, United States District Judge:

Petitioner Jose Carrion petitions this court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his March 15, 2001 conviction in New York State Supreme Court, Bronx County, for the crimes of Murder in the second degree and Assault in the first degree. Petitioner is currently serving concurrent sentences of twenty-five (25) years to life for the murder conviction and twenty (20) years for the assault conviction.

Petitioner bases his petition on the sole claim that two of the trial court's evidentiary rulings were so fundamentally unfair that they denied him due process under the Fourteenth Amendment.[1] Specifically, petitioner complains that the trial judge erred in ruling that defense counsel's

---

[1] In his petition, counsel for petitioner alludes to a denial of his Sixth Amendment right to confront a prosecution witness, thereby suggesting a potential Confrontation Clause issue in addition to a Due Process Clause claim. In his reply papers, and again during oral argument, however, counsel for petitioner clearly stated that he intended to raise only a due process claim, and that any reference to the confrontation clause exists only in connection with this due process argument. Therefore, the Court will not treat this petition as raising a violation of the Sixth Amendment Confrontation Clause.

1

questioning of the prosecution's sole eyewitness about a prior misidentification of another robber in a photo array "opened the door" to otherwise inadmissible testimony by the same eyewitness that he had previously identified petitioner as one of the robbers in a separate mugbook photograph identification. Petitioner also complains that the trial judge erred in permitting petitioner's mug shot photograph to be introduced into evidence. Both rulings were so fundamentally unfair, he argues, and so influenced the jury's verdict, that they violated petitioner's Fourteenth Amendment due process right to a fair jury trial. The Court does not agree and denies the petition for a writ of habeas corpus.

## BACKGROUND

### The Robbery

Juan Mercedes (a.k.a. "Alberto Nunez") and his employee Juan Ventura, both drug dealers, used apartment 3C at 2675 Morris Avenue in the Bronx to sell drugs. (Trial Tr. ("T.") 94.) On the night of April 20, 1995, while Mercedes and Ventura were in apartment 3C with a customer named Eddie, three intruders forced their way into the apartment and attempted to rob the men of drugs and money.[2] (T. 107-08.) One of the intruders was armed with a .38 caliber weapon, while another intruder was armed with a .25 caliber weapon. (T. 109.) Eddie was taken by one of the intruders into the bedroom, where he was beaten. (T. 108, 109.) Mr. Mercedes told the intruders that he did not have any drugs or money in the apartment and tried to flee, but once he got to the hallway the intruder with the .38 caliber weapon started to struggle with Mr. Mercedes. (T. 110-13.) When the intruder could not get Mr. Mercedes back into the apartment, he shot him in the head and chest at

---

[2] Mr. Ventura testified at trial that he had seen the intruder with the .38 caliber weapon (the intruder that he identified as Jose Carrion) before the incident, at a pizza place and "hanging out in the corner," but that he had not seen the other two intruders before the incident. (T. 118.)

2

close range. (T. 51, 83, 274, 277, 326.) Before the three robbers fled the building, the intruder with the .38 caliber weapon announced, "I am going to kill you now," and shot Mr. Ventura in the buttocks. (T. 116, 117, 319.) Mr. Ventura followed the intruders out of the building and watched them get away, and then told a passerby to call the police because he and his friend had been shot. (T. 120-21.) Emergency medical technicians took Mr. Ventura to Jacobi Hospital to be treated for his gunshot wound. (T. 121.)

The Investigation

Officers responded to the scene shortly before midnight. (T. 395) In the early morning hours of April 21, 1995, Detective Ciuffi of the New York Police Department spoke with Mr. Ventura at Jacobi Hospital. (Wade Hearing Tr. 3, Jan. 10, 2001.) Mr. Ventura told the detective that he and his friend had been shot, and that there had been one Hispanic and two black assailants.[3] (T. 346, 350.) He identified the Hispanic assailant as the shooter and described the shooter as 20-21 years of age, 5'10" tall, with a goatee, pimples or a mole, and light freckles, and wearing a black "Boss" jacket, black slacks, and a white bandana with black dots.[4] (T. 346-47.) To hide his involvement with drug sales at apartment 3C, Mr. Ventura falsely represented to the detective that he encountered the shooter in the fifth floor stairwell, the shooter shouted "Move it, move it," and then shot him. (T. 345, 352.)

On April 23, 1995, Detective Ciuffi returned to the hospital to question Mr. Ventura further.

---

[3] Mr. Ventura later changed his description, testifying before the grand jury that there were three Hispanic assailants. (T. 362.) This discrepancy was fully explored by defense counsel during cross-examination. (T. 407-12.)

[4] Mr. Ventura testified at trial that the person with this description carried the .25 caliber weapon, and that his original identification was confused "because [he] had never been in an investigation of a case like this." (T. 348.)

3

Mr. Ventura, who was "very belligerent," viewed a photo array of potential suspects and told the detective that one of the men "looked like the one who had the .25" (Trial Tr. 354-55, 427). The detective later learned that Michael Rivera, the man identified by Mr. Ventura, was incarcerated at the time of the shooting so could not have been involved in the crime, as Mr. Ventura had suggested.[5] (T. 476-77.)

On April 28, 1995, Mr. Ventura met with Detective Ciuffi and Detective Ortiz–who spoke Spanish to Mr. Ventura–at the 52nd Precinct to look at more photographs. (Wade Hearing Tr. 4, 5.) Mr. Ventura was still "very belligerent." (T. 461.) Mr. Ventura picked Carrion's photograph out of one of the books and identified him as the Hispanic shooter. (Wade Hearing Tr. 6, 7.) The next day, three detectives met with Mr. Ventura at his home and took Mr. Ventura's statement about the incident and descriptions of the assailants. (T. 462-63.) This time, Mr. Ventura gave a different account of what transpired, admitting that he entered apartment 3C just before the shooting, but stating that he left the apartment before any shots were fired and only heard the gunshot that killed Mr. Mercedes from the lobby. (T. 408-10.) After that meeting, Detective Ciuffi attempted to contact Mr. Ventura on several occasions, because he did not believe that Mr. Ventura was telling the truth about not witnessing Mr. Mercedes's death, but Mr. Ventura did not return the detective's telephone messages. (T. 464, 467.)

After more than three years had passed, on September 3, 1998, Detective Ciuffi met with Mr. Ventura at the Altona Correctional Facility, where Mr. Ventura was serving a five to ten-year sentence for an unrelated drug crime. (Wade Hearing Tr. 7, 8; T. 95-96.) Mr. Ventura provided

---

[5] This is the misidentification that defense counsel questioned Mr. Ventura about on cross-examination.

4

Detective Ciuffi a more detailed statement of the crime and description of the assailants. Since he was already in jail for another drug-related crime, and so not worried about possible identification as a drug dealer because he was in apartment 3C with drug paraphernalia, Mr. Ventura cooperated with police and agreed to tell the truth about what happened on the night of April 20, 1998.[6] (T. 445-46, 503.)

On May 17, 1999, Mr. Ventura viewed a six-suspect photo array at the Bronx District Attorney's Office and identified Carrion as the person who shot and killed Mr. Mercedes. (Wade Hearing Tr. 8, 9.) As a result this identification, Detective Ciuffi had Carrion placed in custody. (Wade Hearing Tr. 12.) On May 26, 1999, Mr. Ventura came to the 48th Precinct and viewed a lineup, at which he again identified Carrion as the shooter. (Wade Hearing Tr. 12, 16; T. 146-48.) As a result of this lineup identification, police arrested Carrion in May 1999 and indicted him for the murder of Juan Mercedes and the attempted murder of Juan Ventura.

## The Trial

A jury trial was held before Judge Steven L. Barrett of the New York Supreme Court, Bronx County, Criminal Term in January 2001. The only evidence linking Carrion to the crime was Mr. Ventura's identification testimony.

Judge Barrett held a <u>Wade</u> hearing on January 10, 2001. (Wade Hearing Tr. 1.) Defense counsel moved to suppress both of Mr. Ventura's mugbook photo identifications of Carrion and his later line-up identification of Carrion. Based on Detective Ciuffi's testimony about the photo array

---

[6] When the incident occurred on April 20, 1995, Mr. Ventura was on probation for a drug-related crime. (T. 96, 159.) Therefore, Mr. Ventura feared that association with apartment 3C would land him in prison for violation of the terms of his parole. (T. 149-50.) In addition, Mr. Ventura planned to continue selling drugs, so he did not want police suspecting him. (T. 149, 157.)

5

and lineup identifications by Mr. Ventura, the court found that no suggestive procedures were employed by the police that would preclude use of otherwise admissible identifications. (Wade Hearing Tr. 21.) Judge Barrett ruled that the line-up identification was admissible evidence, but the prosecution could not raise the photo identifications as part of their direct case. (Wade Hearing Tr. 21, 22.) Pursuant to defense counsel's request, the Court also ruled that the defense could raise Mr. Ventura's earlier photo-array misidentification of Mr. Rivera as one of the robbers on cross-examination, in order to impeach Mr. Ventura's credibility as an identification witness, though he questioned the propriety of this strategy. (Wade Hearing Tr. 22, 23.)

Mr. Ventura identified Carrion as the shooter with the .38 caliber weapon as part of the prosecution's direct case. (T.118-19, 146.) He also testified to the lineup identification in May 1999. (T. 144-48.) A photograph of the lineup was entered as People's Exhibit 19. (T. 148.)

On cross-examination, Carrion's trial attorney attempted to impeach Mr. Ventura as a lying drug dealer with no credibility. He questioned Mr. Ventura about the inconsistencies in his original statements to police. (T. 406-17; 419-23); see also supra n.2; infra n. 7. He emphasized the fact that Mr. Ventura originally lied to detectives to protect himself and his drug dealing, had changed his version of events numerous times,[7] and had previously misidentified one of the other shooters,

---

[7] There were many inconsistencies in Mr. Ventura's original accounts of the incident to detectives. Mr. Ventura originally told detectives that there were 2 black intruders and 1 Hispanic intruder, and that one of the black intruders carried the .38 caliber while the Hispanic intruder carried the .25 caliber weapon. (T. 346, 350.) Since this is not consistent with Mr. Carrion carrying the .38, he later changed his statement. (T. 362.) Also, Mr. Ventura originally told police that he was not in apartment 3C when the shooting occurred, but was walking down from the fifth floor stairwell when he encountered the intruders. (T. 345, 352.) He later told Detective Ciuffi that he was in the apartment when the intruders barged in, but fled the apartment before Juan Mercedes was shot. (T. 408-10.) Mr. Ventura later changed his story again, telling detectives that he was inside apartment 3C at the time of the shooting. (T. 416-17.)

picking a man out of a photo array who was incarcerated at the time of the crime. (T. 346-56.)

After Carrion's trial counsel questioned Mr. Ventura on the misidentification of one of the other perpetrators, the prosecution made an application to admit into evidence testimony of Mr. Ventura's April 28, 1995 mugbook identification of Carrion. (T. 359-60.) The prosecution argued that once defense counsel questioned Mr. Ventura about the misidentification, he "opened the door" to further testimony about Mr. Ventura's other photographic identifications, which were otherwise inadmissible under New York evidence law. (T. 359.) The court overruled defense counsel's objections, and the prosecution introduced Mr. Ventura's April 1995 precinct mugbook identification of Carrion as the shooter.[8] (T. 379-80.)

The trial court explained that, once defense counsel questioned Mr. Ventura about the misidentification, he brought into the trial certain questions about photographic identification procedures that could mislead or confuse the jury. (T. 364-65.) In light of this risk, the policy that underlines the New York statute protecting defendants from evidence regarding photographic identifications no longer took precedent over "the desire of the jury not to be misled or confused." (T. 365. ) The Court quoted a passage from the leading treatise on New York identification law warning the "unwary defense attorney" of the risks of the "door-opening doctrine," and explaining that "counsel might inject an issue into the trial that renders previously irrelevant testimony relevant," which is exactly what defense counsel did in this case. (T. 377-78 (quoting Miriam Hibel, New York Identification Law).)

On redirect, the prosecution questioned Mr. Ventura about the April 1995 mugbook

---

[8] The Court ruled that the 1999 identification of the defendant by Mr. Ventura remained inadmissible. (T. 383.)

7

identification of Carrion. (T. 436-37.) The prosecution then moved to enter the mugbook photograph of Carrion into evidence. (T. 437.) The Court then entered the mugbook photograph into evidence as People's Exhibit 26, but with all "mugbook" indicators redacted.[9] (T. 436, 442.) The Court gave the jury a limiting instruction, explaining that the jury could not infer from the existence of the photograph that defendant had a prior criminal history and that the jury could not draw any inferences from the fact that the prosecution did not raise the photograph identification of defendant on its direct case, as it was not permitted to do so. (T. 443-44.)

At the close of all the evidence, defense counsel moved to dismiss the case for prosecution's failure to make out a prima facie case or meet its burden of proof beyond a reasonable doubt. (T. 525-36.) The Court declined to entertain this motion. (T. 526.) Intentional murder, felony murder, and manslaughter in the first degree were all advanced to the jury with respect to the killing of Mr. Mercedes. (T. 528-29.) Attempted murder, assault in the first degree, and assault in the second degree were advanced to the jury with respect to the shooting of Mr. Ventura.

The jury deliberated for three days before returning its verdict. During deliberations, the jury asked the court for a number of clarifications, including a read back of portions of the testimony of Mr. Ventura and Detective Ciuffi that highlighted the inconsistencies in Mr. Ventura's story and that discuss where Mr. Rivera, the misidentified perpetrator, was on the night of the crime. (T. 723-27.) They also asked to see the mugbook photograph of Carrion and wanted to know what year the photograph was taken (information the trial court refused to provide because it was not in evidence). (T. 728.) On the second day, the jury reported to the Court that it was deadlocked and

---

[9] See infra note 10 for a more detailed description of the circumstances under which the photograph was allowed into evidence.

unable to reach a verdict, but the Court instructed the jury to continue deliberating. (T. 736-39.) The next morning, the jury asked for definitions of "reasonable doubt," "burden of proof," "inference," and "speculation," in addition to asking for direction on how to assess testimony that contains multiple inconsistencies. (T. 746.) Late on the third day, the jury found defendant guilty of second-degree felony murder and assault in the first degree. (T. 796-98.) Carrion was sentenced to twenty-five (25) years to life for the murder conviction and twenty (20) years for the assault conviction. (Petr.'s Mem. of Law 28.)

Procedural History

Carrion filed a timely notice of appeal with the Appellate Division, First Department ("First Department") on May 8, 2001. (Pet. ¶ 8.) Carrion argued on appeal that the trial court's determination that defense counsel had "opened the door" to additional photographic identification testimony by Mr. Ventura, simply by questioning Mr. Ventura about a prior misidentification in an effort to impeach Mr. Ventura's credibility, was such an erroneous application of New York identification law that it denied Carrion due process under the Fourteenth Amendment. (Levy Aff. ¶ 2 & Ex. 1, p. 25-32.) On November 6, 2003, the First Department unanimously affirmed the judgment of the trial court, holding that evidence of Mr. Ventura's April 1995 photographic identification of Carrion was properly admitted "to dispel a misleading impression conveyed by the defense" and that any prejudice arising from that evidence was minimized by the judge's limiting instruction. People v. Carrion, 1 A.D.3d 109, 109 (2003).

Carrion filed leave to appeal to the New York Court of Appeals. 1 N.Y.3d 596 (2004) (Table). On January 13, 2004, the Court of Appeals found no question of law requiring review and thereupon denied Carrion's application for leave to appeal. Id. Carrion filed this petition for a writ

of habeas corpus on January 12, 2005, within the one-year statute of limitations dictated by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2244(d)(1). (Verified Pet. 8.)

## DISCUSSION

28 U.S.C. § 2254 does not empower the federal habeas court to determine the guilt or innocence of the defendant; nor may the habeas court weigh the credibility of trial witnesses. These tasks were for the jury at petitioner's criminal trial. This Court's role is to ascertain whether there has been a "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254; see also Coleman v. Thompson, 501 U.S. 722, 730 (1991) (cautioning that on habeas corpus review, "the court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*"). The only issue before this Court on habeas corpus is whether the trial court violated petitioner's federal constitutional rights by ruling that evidence of a witness's photographic identification of the defendant was admissible on redirect examination at trial, after defense counsel had questioned the witness about a prior photographic misidentification of one of the other perpetrators.

Petitioner advances two wholly different arguments to support his due process claim. In his papers, petitioner argues that the trial court's ruling that defense counsel opened the door to otherwise inadmissible identification testimony by questioning the prosecution's sole eyewitness about a prior photographic misidentification rises to the level of constitutional error. Petitioner further argues that letting the mugbook photograph into evidence,[10] to be viewed by the jury, was

---

[10] The trial court suggested that, rather than enter the picture into evidence, the parties stipulate that the subject photograph was the photograph selected by Mr. Ventura in April 1995. (T. 439.) Defense counsel objected to such a stipulation, however, so the picture itself was entered into evidence, but with profile shots excluded and all markings identifying the picture as a mugshot redacted. (T. 439.) The trial judge provided the jury with a cautionary instruction at the time the photograph was entered into evidence, warning them that they could not conclude from the admission of the photograph that petitioner has a prior criminal record. (T. 440-44.)

10

also constitutional error.

During oral argument, however, petitioner's counsel adds a Biggers and Wade argument. Specifically, petitioner argues that the trial court's rulings violate due process because the photographic identifications were inherently suggestive, and should have been excluded at the Wade hearing, so that they could not be shown to the jury at the trial, as they eventually were. Petitioner's papers must be read very closely to find even a hint of this argument, and it was not mentioned at all in petitioner's appeal to the First Department. Nonetheless, the Court will address both arguments in its decision.

I. CONSTITUTIONAL ERROR

A. Habeas Corpus Review is Not Available for Errors of State Law

It is a well-settled principle that "federal habeas corpus relief does not lie for errors of state law." Estelle v. Mcguire, 502 U.S. 62, 67-68 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)); see Benitez v. Senkowski, No. 97 Civ. 7919, 1998 WL 668079, at *4 (S.D.N.Y. Sept. 17, 1998); James v. Senkowski, No. 97 Civ. 3327, 1998 WL 217903, at *5 (S.D.N.Y. Apr. 29, 1998); Simmons v. Ross, 965 F. Supp. 473, 480 (S.D.N.Y. 1997). "In general, rulings by the state trial court on evidentiary questions are a matter of state law and pose no constitutional issue." Estelle, 502 U.S. at 67-69; Benitez, 1998 WL 668079, at * 4 (quoting Roberts v. Scully, 875 F. Supp. 182, 189 (S.D.N.Y.), aff'd mem., 71 F.3d 406 (2d Cir. 1995); see James, 1998 WL 217903, at *5; Simmons, 965 F. Supp. at 480. The Second Circuit has cautioned that alleged "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." DiGuglielmo v. Smith, 366 F.3d 130, 136 (2d Cir. 2004). Petitioner fails to cite to any federal case that has held that the admission of a photographic identification under these circumstances rises to the level of

constitutional error, likely because no such case law exists.

Under New York common law, "it is improper to admit testimony from a . . . witness that he identified the defendant from a photograph." People v. Giallombardo, 128 A.D.2d 547, 548 (2d Dep't 1987). This is not an absolute rule, however, and otherwise inadmissible photographic identification testimony may become admissible "where the defendant opens the door to this inquiry during his cross-examination of the witness," id., or "to cure a misleading impression created by defendant's cross-examination."[11] People v. Givens, 271 A.D.2d 372, 372 (1st Dep't 2000); see People v. Melendez, 55 N.Y.2d 445, 451 (1982); People v. Cuiman, 229 A.D.2d 280, 284 (1997); see also NY Crim. Proc. §§ 60.25, 60.30 (demonstrating other statutory exceptions to the common law rule against the admissibility of out-of-court identifications). The New York Court of Appeals has expressly warned: "Where . . . the opposing party 'opens to door' on cross-examination to matters not touched upon during the direct examination, a party has the right on redirect 'to explain, clarify and fully elicit [the] question only partially examined' on cross-examination." Melendez, 55 N.Y.2d at 451 (quoting People v. Regina, 19 N.Y.2d 65, 78 (1966)). This is exactly what happened in petitioner's criminal trial.

Petitioner's counsel is correct that defense counsel "had a right to cross-examine Ventura as

---

[11] The rationale behind this New York common law rule is to protect defendants from prejudice caused by the use of "mugbook" photographs, which could lead the jury to infer that the defendant had a prior criminal record, and to prevent inappropriate bolstering of in-court identifications. See Caserta, 19 N.Y.2d at 21. Where, as in this case, the defendant undermines this policy by first introducing photographic evidence on cross-examination of the witness, thereby introducing potentially misleading or confusing evidence of photographic identifications to the jury, the defendant may lose the protection of this common law rule. See Miriam Hibel, New York Identification Law 359-63(3d ed. 2004). As the trial judge recognized, once the defendant opens the door, "the policy that underlines the New York statute [no longer] takes precedence over the desire of the jury not to be misled or confused." (T. 365.) This "door opening doctrine" is well entrenched in New York Law. See Hibel, supra, at 359-63.

to the prior erroneous identification of the .25 perpetrator" in order to call into doubt the witness's general ability "to make an accurate identification." (Petr.'s Mem. of Law 29.) The trial court allowed defense counsel to cross-examine Mr. Ventura, and did not strike defense counsel's questions regarding the misidentification. However, this strategy came at a price, one which petitioner is now unwilling to pay. Indeed, to avoid the consequences of his own strategy, petitioner goes so far as to claim that the trial court's evidentiary rulings constitute a violation of his due process rights.

Like the "unwary defense attorney" in Hibel's treatise on identification law, by questioning Mr. Ventura about his prior misidentification, defense counsel raised questions in the minds of the jurors about photographic identification procedures. The trial judge determined that this misidentification testimony could mislead or confuse the jury. The trial judge permitted no more than what New York law allows: give the prosecution an opportunity to counter potentially suggestive evidence by offering to the jury its own evidence of photographic identifications. In light of New York law on identification evidence, it is clear that the trial court's decision to permit the prosecution's witness to testify about a prior photographic identification and to admit the redacted mugbook photograph into evidence was not an error of state law, let alone a constitutional error. This Court is without authority to review the trial court's rulings on this habeas petition.

On a petition for a writ of habeas corpus, this Court may not scrutinize the trial court's evidentiary rulings or assess whether the trial court properly applied the New York "door opening" doctrine. The trial judge's decision was a reasoned one, and is firmly supported by New York law, as the First Department found on petitioner's appeal. This Court will not, indeed cannot, second guess this decision. It is not an error of state or federal law, and so cannot be the basis for a writ of

habeas corpus.

B. Petitioner's Criminal Trial Was Not Fundamentally Unfair

Even if, assuming *arguendo*, the trial court's two rulings amounted to an error of state evidentiary law–and the Court finds that they do not–the error was harmless and, therefore, cannot support a writ of habeas corpus. A state evidentiary ruling may violate due process only if the erroneously admitted evidence had such a substantial effect on the jury's verdict that it deprived petitioner of a fair trial. Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) (defining standard for harmless error); Rosario v. Kuhlman, 839 F.2d 918, 924-25 (2d Cir. 1988); Benitez, 1998 WL 668079, at *4 ("Issues regarding the admissibility of evidence in state court . . . are not subject to federal review unless the alleged errors are so prejudicial as to constitute fundamental unfairness." (quoting McCray v. Artuz, No. 93 Civ. 5757, 1994 WL 603057, at *2 (S.D.N.Y. Nov. 3, 1994))); James, 1998 WL 217903, at *5; Watson v. Kelly, 91 Civ. 7925, 1996 WL 409198, at *3 (S.D.N.Y. July 22, 1996). The petitioner bears the "heavy burden" of establishing that the trial court's error was fundamentally unfair. Benitez, 1998 WL 668079, at *5; Roberts, 875 F. Supp. at 189; James, 1998 WL 217903, at *3. To establish fundamental unfairness, petitioner must show that "the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985) (internal citations omitted).

Petitioner urges the Court to find that the trial court's rulings pertaining to photographic identification evidence were so suggestive that they denied petitioner a fair jury trial, in violation of

14

the Fourteenth Amendment. To bolster this position, petitioner draws the Court's attention to the numerous inconsistencies in Mr. Ventura's statements to police prior to the trial. He also draws the Court's attention to the uncertainty expressed by the jury at various points during their three days of deliberation.

But this alone is not sufficient to establish that petitioner's criminal trial was fundamentally unfair. In addition to Mr. Ventura's testimony regarding the April 1995 mugbook identification of petitioner, the jury heard the witness's in-court identification of petitioner and testimony of his May 1999 lineup identification of petitioner as the shooter. The jury also heard testimony that Mr. Ventura had seen petitioner in the neighborhood before the incident and had ample opportunity to view petitioner while the crime was in progress. Whatever inconsistencies existed in Mr. Ventura's statements were fully explored, as were his explanations, during direct and cross-examinations and during summation. It was the job of the jury to assess Mr. Ventura's credibility, and therefore decide what weight to give Mr. Ventura's testimony. The jury had ample testimony, even without the 1995 mugbook identification evidence, upon which it could find Mr. Ventura's testimony credible and accurate. In light of the evidence, it was not objectively unreasonable for the jury to find petitioner guilty of the crime. Therefore, the Court cannot find, when viewing the record as a whole, that the excised and redacted mugbook photograph and witness testimony of a prior photographic identification of petitioner as the shooter provided the basis for petitioner's conviction or removed reasonable doubt that would have existed in the minds of the jurors without it.

Similarly, the fact that the jury deliberated for three days, or asked for additional clarifications, does not establish that the mugbook identification had a substantial effect on the jury's verdict. Many of the read-backs, photographs, and clarifications requested by the jury during

15

deliberations had nothing to do with the mugbook identification now questioned by petitioner. Therefore, petitioner cannot argue that the long deliberations and additional clarification prove that the jury would not have convicted petitioner without this photographic evidence. Viewing the record in its entirety, the Court cannot conclude that the photographic identification evidence had a substantial and injurious effect on the jury's verdict against petitioner. Therefore, petitioner has failed to establish actual prejudice.

## II. SUGGESTIVENESS OF THE EVIDENCE

At oral argument, petitioner's counsel veered in a slightly different direction, arguing that the petitioner's due process claim is rooted in the Supreme Court's holdings Biggers and Wade that evidence derived from suggestive identification procedures is inadmissible at trial. See Neil v. Biggers, 409 U.S. 188, 198 (1972); United States v. Wade, 388 U.S. 218, 228-29 (1967). This argument is wholly misplaced. The parties do not dispute that the trial court held a Wade hearing before petitioner's criminal trial. At the Wade hearing the trial court took testimony from Detective Ciuffi, who was present during each identification, and reviewed all photographs leading to Mr. Ventura's identifications of petitioner. Based upon this evidence, the Court found that all identification procedures were conducted "in a fair manner," and therefore were not suggestive.[12] In

---

[12] In the Wade Hearing, the trial court ruled, on other grounds, that the photographic identifications were not admissible on the prosecution's direct case. The basis of this ruling was the long-held New York policy that a prosecution witness may not testify at trial to a prior photographic identification of the defendant, because photographic identifications allow bolstering and risk "the inference to the jury . . . that the person has been in trouble with the law before." People v. Caserta, 19 N.Y.2d 18, 21 (1966). This rule is a state evidentiary rule, which is cognizable on habeas review only to the extent that it rendered the trial fundamentally unfair. See Part I supra. Since the trial court's decision to exclude the photographic identification evidence from the prosecution's direct case was based on New York policy, it cannot now be used—as petitioner's counsel attempts to do—to support petitioner's argument that the photographic identification evidence was impermissibly suggestive, and therefore its later

16

fact, the court expressly stated: "[I]t is apparent to the Court there was no suggestive procedure employed by the police." (Wade Hearing 21:4-21:6.) Defense counsel did not object to this finding.

All Biggers and Wade require is that the trial court determine, at a hearing outside of the presence of the jury, that the identifications later entered into evidence were not obtained by unduly suggestive means. The trial court made such a determination at the Wade hearing held in connection with petitioner's trial. Petitioner himself concedes in his petition that, under Biggers, "convictions based on eye-witness identification . . . will be set aside only if the photographic identification was so impermissibly suggestive as to give rise to a very substantial likelihood of . . . misidentification." (Pet. 34 (quoting Biggers, 388 U.S. at 196-97) (internal quotation marks omitted). "It is the likelihood of misidentification which violates a defendant's right to due process," so "the admission of evidence of evidence of a showup, with more does not violated due process." Biggers, 388 U.S. at 198. The same logic applies to the admissibility of photographic identification evidence. See, e.g., Styers v. Smith, 659 F.2d 293, 297-98 (2d Cir. 1981) (applying "impermissibly suggestive" standard to photographic identification of defendant by witness). As the trial court found at the Wade hearing, Mr. Ventura's 1995 photographic identification of petitioner was not "impermissibly suggestive," so its admission by the trial court did not violate petitioner's due process rights. Petitioner's counsel's argument to the contrary is without merit; petitioner's counsel cannot, in good faith, argue in this habeas petition that the trial court's decision to admit evidence of Mr. Ventura's 1995 mugbook identification of petitioner violated Biggers and Wade.

Regardless, petitioner did not raise the Biggers and Wade argument in his appeal before the

---

admission by the trial court violated Biggers and Wade.

17

First Department, so it is not available to petitioner on habeas corpus. While petitioner raised a due process claim in his appeal to the First Department, his claim focused on constitutional error and a fundamentally unfair trial as a result of the trial court's evidentiary rulings, not on the impermissible suggestiveness of the identification evidence under Biggers and Wade. The Supreme Court has held that a petitioner must present his federal constitutional claims to the state appellate courts before a federal court may review these claims on habeas corpus. See O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Petitioner's failure to properly develop his Wade and Biggers claim before the First Department renders its unexhausted,[13] and therefore unavailable to petitioner as a basis for habeas relief.

## CONCLUSION

After careful review of the petition, the Bronx County District Attorney's opposition, and all transcripts from the trial below, the Court finds that the trial court's admission of petitioner's mugbook photograph and testimony regarding a prosecution witness's photographic identification of petitioner was not constitutional error. Since a habeas court may not review a state court judgment in the absence of constitutional error, Mr. Carrion's petition for a writ of habeas corpus is

---

[13] A habeas petitioner must first "exhaust[] the remedies available in the courts of the State." 28 U.S.C. § 2254(b). It is in the context of this provision that the Supreme Court held in O'Sullivan that "state prisoners must give the state courts one full opportunity to resolve any constitutional issues . . . [through] the State's established appellate review process" before it may be raised in a petitioner for a writ of habeas corpus. O'Sullivan, 526 U.S. at 845.

denied. The Clerk of the Court is directed to enter judgment dismissing the petition and closing out the case.

SO ORDERED

*[signature]*
PAUL A. CROTTY
United States District Judge

Dated: New York, New York
November 15, 2005

COPY MAILED/ FAX TO:_____
COUNSEL FOR PLTFF(S):_____
COUNSEL FOR DFT(S): Yael Levy
PLTFF. PRO SE:_____
DFT. PRO SE:_____
DATE: 11-15-05
BY: Marlon Ovalles
L.R.D